Filed 6/24/21  P. v. Tanks CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B304432 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA091031) |
| v. | |
| RONALD OTIS TANKS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David W. Stuart, Judge. Affirmed with directions.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for the Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Analee J. Brodie, Deputy Attorney General, for Plaintiff and Respondent.

———————————————

The jury found defendant and appellant Ronald O. Tanks guilty of attempted premeditated and deliberate murder.  (Pen. Code, §§ 187, subd. (a)/664 [count 1].)[1]  It found true the allegations that in the commission of the crime, Tanks personally inflicted great bodily injury on the victim (§ 12022.7, subd. (a)), and personally and intentionally discharged a firearm proximately causing great bodily injury (§ 12022.53, subd. (d)).

The trial court sentenced Tanks to life with the possibility of parole in count 1, plus 25 years to life for the section 12022.53, subdivision (d) enhancement, plus 3 years for the great bodily injury enhancement.

Tanks contends that (1) his attorney's actual conflict of interest requires reversal of his convictions; (2) the trial court erred in denying his motion to relieve counsel; (3) the trial court erred in denying his motion to suppress evidence; (4) the trial court erred by admitting his prior conviction while excluding the prior convictions of the victim and his

—————————

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

former co-defendant; (5) the trial court erred by admitting evidence of the victim's mental state; (6) the prosecutor delayed in providing exculpatory evidence; (7) the trial court failed to properly instruct the jury; (8) these errors were cumulative; and (9) there are errors in the court's minute order with respect to fines and fees.

We agree with the parties that the minute order dated January 15, 2020, does not properly reflect the trial court's oral pronouncement at sentencing. We order the notations that the trial court imposed a $300 restitution fine (§ 1202.4, subd. (b)), a $300 suspended parole revocation fine (§ 12022.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 criminal conviction assessment (Gov. Code, § 70737) be stricken from the minute order. In all other respects, we affirm the trial court's judgment.

## FACTS

### *Prosecution Case at Trial*

#### Victim Testimony

The victim, Juan Barajas,[2] lived in an apartment with several other people. Barajas knew Tanks because he lived

---

[2] Barajas admitted that in 2007, he was convicted of felony transportation and sale of narcotics (Health & Saf. Code, § 11352, subd. (a)).

in the same apartment complex.  Tanks lived with his girlfriend, Deborah Griffin.

On May 20, 2018, Barajas was in his apartment when Tanks arrived, looking for Graciella Salas, who also lived there.  Tanks was angry.  He yelled at Salas and "tried to hit" her.  Barajas told Tanks to leave.  Barajas grabbed a baseball bat because he was afraid of Tanks, but he did not hit him or even threaten him with it, "because perhaps he will hit me."  Barajas did not pull a gun on Tanks.  Tanks insulted Barajas and left.  Barajas believed Tanks disliked him because he thought Barajas was dating Salas.[3]

Later that afternoon, Barajas went to a liquor store and bought alcohol.[4]  He drove home quickly, worried that Tanks would return and threaten Salas or another roommate.[5]

Barajas parked his car in the garage.  He did not notice that Tanks had followed him inside.  When Barajas got out

---

[3] Barajas was not certain how much time elapsed between the argument in the morning and the shooting, but he thought it was a matter of hours.

[4] Barajas admitted to ingesting methamphetamine and beer that day.

[5] A woman who lived in unit 112 of the building was on her balcony at approximately 5:20 p.m.  She saw Barajas's car go "screeching" into the parking area.  She saw Tanks "running after it."  She heard four or five gunshots as she was returning to her apartment.

of his car, Tanks approached and pointed a gun at his face. Tanks said he was going to kill Barajas. He pulled the trigger but the gun did not fire.

Barajas threw a can of alcohol at Tanks, but missed. Tanks shot him in the leg and Barajas collapsed. Tanks fired again, hitting Barajas in the shoulder. Tanks fired another bullet into Barajas's car.

Tanks told Barajas, "Open your mouth because I am going to kill you." He put the gun in Barajas's mouth and pulled the trigger, but the gun was out of bullets. Tanks stood up and got a baseball bat.[6] He beat Barajas with the bat. Barajas raised his arm to shield his head, and Tanks broke Barajas's arm with the bat.

Barajas was hospitalized for four days. His left shoulder was dislocated by the gunshot. Screws were required to repair the bones in his hip.

### Investigation Evidence

Los Angeles Police Department Officer Jose Moya arrived at the scene at 5:23 p.m. He observed Dedrick Cook, who looked "scared," riding away on a bicycle. Another officer stopped Cook, and Cook admitted he had a gun in his backpack. The gun, a revolver, contained four spent bullet casings. Cook told officers that Tanks had called him and

---

[6] At trial, Barajas identified the baseball bat recovered from Griffin's apartment as the one Tanks used to beat him.

said he was "having some trouble" with someone, and told him to bring a gun.  Cook denied having shot anyone, and said he did not know if anyone had been shot.   Cook said Tanks and the victim had "got into it about some woman."  Cook offered to show the officers the text messages from Tanks on his phone.

After Cook was arrested, he was placed in a patrol car and interviewed there by Officer Moya.  The video of Cook's interview was played at trial.  Cook told the officer, "I'm not Tank," and "I didn't shoot the dude."  He did not know the victim; he only knew that the victim had arrived in a white car.  During the interview, calls and messages from "Tank" came in to Cook's cell phone.

Los Angeles Police Department Officer Erik Peña interviewed Barajas, who identified Tanks as the shooter in a photographic lineup.  Barajas testified consistently with the statement of facts above.  Officer Peña asked Barajas if he had a gun.  Barajas said he did not.

Later that evening, Officer Peña went to Tanks's apartment.  Tanks was not there, but his girlfriend, Deborah Griffin, let officers into the apartment to look for him.  Officers seized a small black baseball bat leaning against a dresser near the bed, which Griffin stated Tanks brought with him to the apartment that afternoon.

Tanks was arrested four days after the incident, waived his right to remain silent, and was interviewed by Detective Donald Goossens.  The video of the interview was played for the jury.

Tanks denied knowing Cook, and denied that Cook gave him a gun to use. Tanks said he went to Barajas's apartment on the morning of the shooting, looking for Salas, who was his girlfriend. "Well," he clarified, "another girlfriend I have . . . in [Barajas's] house." He went to see Salas and confronted her because she had been "gone all night" and did not answer his calls. As Tanks was "gettin' on her," Barajas left the room and returned with a baseball bat. Tanks left the apartment, and Barajas followed him, speaking angrily in Spanish. Barajas told Tanks not to bother his girl, and said that if he saw Tanks again he would kill him. Barajas told Tanks not to talk to Salas or come to the apartment again. Tanks responded, "That's my bitch," and, "I talk to my bitch any time I want."

Approximately 30 minutes later, Tanks was outside the apartment building, talking to Larry Woods and others, when Barajas came out and ran toward him, his hand reaching behind his back. Barajas and Tanks argued. Tanks told Barajas, "I didn't say nothing to you, I was talking to my bitch in your house. Fuck you!" Barajas pulled out a gun and threatened to kill Tanks. Barajas walked away. Woods and Griffin witnessed the threats. As Barajas passed Griffin on the steps going into the building, he displayed the gun and said, "I'll kill Tank, I'll kill Tank." Tanks went back to his apartment because he did not want Barajas to shoot him.

When asked about the baseball bat police recovered from Tanks's apartment, Tanks claimed he found the bat on

the street.  Tanks maintained he did not shoot Barajas, although he heard four shots while he was upstairs in his apartment.

Tanks admitted he texted and called Cook, asking him to come over.  Tanks said Barajas "pulled the gun up on [him]" and said, "I'll kill you dead." According to Tanks, Barajas said this "in front of everybody up there on the street."

Detective Goossens pressed Tanks for the truth, pointing out the inconsistencies between his story and Cook's.  Tanks maintained, "I never shot him."  Tanks said he never had a gun.  Tanks said, "I'm telling you the truth."

### Jail Calls

While in jail awaiting trial, Tanks made recorded telephone calls to Deborah Griffin.  The jail calls were played for the jury.

In one call, Griffin asked Tanks what he wanted her to ask his attorney, who was coming to talk to her.  Tanks told Griffin to tell the attorney she had seen Barajas pull a gun on Tanks.  When Griffin said, "I wasn't there," Tanks replied, "Yeah, well . . . you are now."  He wanted Griffin to say that "Miss Gloven" had seen Barajas display a gun, and that Barajas was "telling everybody he's gonna kill me." Tanks also told Griffin to say that Barajas was "going around paying people in the building to intimidate [her] to – to make [her] back up –whatever."

In another call, Tanks and Griffin discussed a Blythe Street gang member, and whether that person would tell Barajas that "what he's doing is wrong." Griffin was reluctant to do what Tanks asked her to do.

Tanks repeatedly urged Griffin to give a police report to a gang member called "YT." He said, "Please give it to him because . . . [they are going] to keep [Barajas] from coming to court." Griffin repeatedly cautioned Tanks, "Don't say no more. You're being recorded. Shut up."

### Dedrick Cook's Testimony

Cook testified at trial, after negotiating a plea and accepting a reduced sentence of nine years for the attempted murder of Barajas and two drug trafficking charges. Cook sold drugs to make money. Before the shooting, he had known Tanks for two or three months. He saw Tanks "on a regular basis." Tanks's name and phone number were in Cook's phone. He knew Tanks's girlfriend was "Cat," but Salas was also Tanks's friend.

On the day of the shooting, Cook was staying in a hotel. He took a nap and awoke in the afternoon to several missed calls and text messages from Tanks. He did not respond right away. Around 5:00 p.m., he called Tanks. Tanks told Cook to come to him and bring his gun, which he referred to as Cook's "little friend." He said "someone pulled a gun on him over a bitch." Tanks seemed "alarmed," at least when the earlier incident occurred. Cook rode to

Tanks's apartment building on his bike, with the gun in his backpack.  He also had a small baseball bat strapped to his bike, and some drugs in his backpack.  The drugs were for sale and for personal use.

Tanks and Woods were on the sidewalk in front of the apartments when Cook rode up.  Tanks told Cook to give him the gun.  It was a revolver loaded with four bullets.  Cook gave Tanks the gun.  Cook noticed Barajas's car "hauling ass" down the street.  The car pulled into the parking garage and Tanks "instantly" went in after it.  Cook, straddling his bicycle, followed.  He hid between two cars and watched.  Tanks hid behind the pillar near the spot where Barajas parked.  Barajas got out of his car with a bag of two or three drink cans in his hand.  Tanks approached and pointed the gun at Barajas.  Barajas lunged at Tanks and the men "started throwing blows back and forth[,]" but the blows did not connect.  At some point, Barajas threw the bag of drinks at Tanks.[7]

Cook heard four shots fired a few seconds apart.  Barajas fell to the ground.  Tanks stood over Barajas, pointing the gun at him, saying something.  Tanks saw Cook watching.  He handed Cook the gun and took the baseball bat Cook had strapped to his bike.  Cook left without seeing what Tanks did with the bat.  When he was almost immediately arrested, Cook said he had nothing to do with

---

[7] Cook did not recall telling police Barajas had "a blunt object" or a bat in his hand, but was reminded by reference to the transcript of that interview.

the shooting "aside from giving [Tanks] the gun." He believed someone was "out to get [Tanks]."

After Cook was arrested, he and Tanks were codefendants for a time. Cook saw Tanks on a jail bus, and Tanks asked him what he was going to do about the case. On several occasions, such as in the holding tank, Tanks tried to dissuade Cook from testifying. He was angry and yelled at Cook. This continued until Cook and Tanks were given "keep away status." When Tanks and Cook were mistakenly placed together in custody at trial, Tanks tried to coerce and manipulate Cook. According to Cook, "He asked me to alter my statement for his benefit."

*Defense*

**Tanks's Testimony**

Tanks testified at trial. He lived with his girlfriend Deborah Griffin. Tanks connected drug dealers with drug seekers in exchange for an occasional referral fee. Tanks recalled Barajas moving into the building in 2009.

On the night of May 19, 2018, Tanks walked to the liquor store. He heard Barajas fighting with his girlfriend. When he returned from the liquor store, Barajas's girlfriend was in the lobby of the apartment building. She had a bruise on her face and a big knot on her forehead. She declined Tanks's offer to help. According to Tanks, Barajas

11

had beaten up his prior girlfriend as well, and had been deported.

The next morning, Tanks went to the apartment where Barajas lived to talk to Woods. He stayed less than five minutes, and did not argue with Salas. Barajas let Tanks into the apartment, then walked away. Barajas was sweaty and appeared to be under the influence of drugs. Salas was there as well, and Tanks talked to her because he was concerned about her safety. Barajas heard them talking and rushed back into the room. Tanks walked out of the apartment, but heard Barajas coming up behind him. Barajas had a baseball bat, and told Tanks, "Motherfucker, don't you talk to my bitch no more. That's my bitch now. You leave her alone. You keep talking to her, I fuck you up." Tanks replied, "Fuck you and that bitch," and walked away and returned to his apartment.

Tanks spoke with Griffin for a while, and then left on an errand around 11:00 a.m. When he returned to his apartment building around 4:00 p.m., he saw Woods outside and stopped to talk to him. Barajas was across the street looking at Tanks. Barajas approached Tanks and Woods, reaching behind his back and into his waistband. He said to Tanks, "Mother-fucker, you want to keep fucking with me, mother-fucker?" and "I'll fuck you up and kill you." Barajas pulled a gun from his waistband. Tanks recognized the gun as a ".22 long barrel, chrome, with a rubber black handle." Barajas pointed the gun at Tanks's chest and again

threatened to kill him.  Tanks and Barajas exchanged insults.

After 10 or 15 minutes of Barajas pointing the gun at Tanks and threatening him, he stuck the gun in his waistband and walked away, still saying he intended to kill Tanks.  Barajas went into the apartment building, flashing the gun at another resident as she walked by.  Barajas told the woman, "I'm gonna kill Tank[s]."

Tanks called Cook but could not reach him.  He did not call the police because they were called to that apartment building regularly for nothing, including his arguments with Griffin.  When Cook returned Tanks's call, Tanks asked for his help.  Tanks referred to Cook's gun as his "little friend."

Cook showed up 10 minutes later.  While Tanks was waiting for Cook, he saw Barajas driving away, pointing his gun at Tanks.  Barajas told Tanks, "I be back [sic]."

About seven minutes after Cook arrived, Barajas came speeding back in his car, and came to a screeching stop in the parking garage.  Tanks asked Cook for the gun he had brought.  With the gun in his hand, Tanks walked into the garage, having decided he would rather be shot at inside the concrete parking structure, "where innocent people wouldn't get hurt."

When Barajas got out of his car and saw Tanks holding a gun, he "turned furious."  Barajas hurled something at Tanks, who ducked and fired his gun to scare Barajas.  The gunshot further enraged Barajas, who charged Tanks.  The men "tussled on the ground," and Barajas "pulled the gun,"

causing it to fire one shot. Barajas held onto the gun, and it fired again. The third time the gun fired, Barajas fell to the ground.

Tanks saw that Barajas had been shot in the leg. Tanks noticed Cook standing nearby. He returned the gun to him, and Cook left on his bicycle. Tanks went home.

According to Tanks, Barajas was associated with the Blythe Street criminal gang. The gang "taxed" Barajas's drug sale proceeds. While Tanks was in jail, Blythe Street gang members asked him to "provide paperwork" regarding the shooting. Tanks felt he had no choice but to cooperate. He told Griffin to make a copy of a police report and give it to a particular gang member.

However, Tanks testified, he eventually gave the police report to a gang member himself but "nothing ever came of it because [Barajas] came in here and testified for [the prosecution]."

Prior to trial, Tanks was once housed with Cook in a holding cell. Although it "hurt [his] feelings" that Cook would testify against him, he did not threaten or intimidate Cook.

Tanks denied telling a detective he went to Barajas's apartment to look for his girlfriend, Salas. He admitted trying to get Griffin to lie and testify that she saw Barajas with a gun, but Griffin "shut that down[.]"

Tanks never used or even had a baseball bat during the fight with Barajas. However, he carried a bat for protection "every day[.]" He admitted he "probably" told detectives he

14

had found the bat seized from his bedroom.  Tanks also admitted lying to police when asked if he knew Cook.  In his text message to Cook on the day of the shooting, he said the problem with Barajas was "a matter of disrespect."

Tanks admitted he lied to police when he said he only heard the gunshots from his apartment.  He lied because he was "scared for [his] freedom" and "trying to lessen [his] role in this at the time."

### Griffin's Testimony

Griffin lived with Tanks.  She heard the "commotion" of the shooting and aftermath, and went outside to look.  She did not know until later who had been shot.  Tanks came home at some point and ate dinner with Griffin.  They watched television, and Tanks went out for beer at some point.  While he was gone, police officers came to the apartment, asking for him.

Griffin told them Tanks was not home.  The officer asked Griffin to step outside, and she did.  The officers went into the apartment, looking for Tanks.  They took a small aluminum baseball bat from the bedroom.  Griffin did not give them permission to take the bat.   Griffin told the officers that Tanks had brought the bat home with him.

On May 24, 2018, police returned to the apartment, looking for Tanks.  Griffin told them Tanks was not at home.

Tanks called Griffin from jail several times.  In one conversation on June 3, 2018, Tanks told her not to go to

15

court after getting a subpoena for someone else. Griffin did not recall a conversation on June 22, 2018, in which Tanks told her to lie and say that she had seen Barajas with a gun. She recalled a conversation they had on June 14, 2018, regarding giving a copy of a police report to a Blythe Street gang member, but stated "[n]othing ever came of it."

Griffin "called immigration" and reported Barajas, and he was deported. She did not recall telling Tanks "it's done" in a phone conversation on August 22, 2018.

### Detective Goossens's Testimony

Detective Goossens testified that he lied to Tanks about several things when questioning him, as a "ruse" to provoke him to deny what the detective suggested.

### DISCUSSION

#### 1. Conflict of Interest

Tanks contends the trial court abused its discretion by denying his motion for new trial based on defense counsel's alleged conflict of interest. We conclude that the trial court did not abuse its discretion because the record does not reveal that it is reasonably probable the potential conflict of interest resulted in deficiencies in counsel's performance, in the absence of which it was reasonably probable that Tanks would have obtained a better result.

16

## Legal Principles

*Motion for New Trial*

Pursuant to section 1181, a defendant may apply for new trial when a verdict has been rendered or a finding made against him under certain enumerated circumstances. "Although ineffective assistance of counsel is not among the grounds enumerated for ordering a new trial under Penal Code section 1181, motions alleging ineffective assistance are permitted pursuant to 'the constitutional duty of trial courts to ensure that defendants be accorded due process of law.' [Citation.]" (*People v. Callahan* (2004) 124 Cal.App.4th 198, 209.) "'On appeal, a trial court's ruling on a motion for new trial is reviewed under a deferential abuse of discretion standard. [Citation.] Its ruling will not be disturbed unless defendant establishes "a 'manifest and unmistakable abuse of discretion.'"' [Citation.]" (*People v. Jimenez* (2019) 32 Cal.App.5th 409, 423.)

*Conflict of Interest*

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to representation free from any conflict of

17

interest that undermines counsel's loyalty to his or her client.  [Citations.]  'It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant.'  [Citation.]  'As a general proposition, such conflicts "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests.  [Citation.]"'  [Citation.]"  (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).)

"[C]laims of Sixth Amendment violation based on conflicts of interest are a category of ineffective assistance of counsel claims that . . . generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different.  [Citation.]  In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest '*that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.'  [Citations.]  '[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect.'  [Citation.]  'An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that

18

adversely affects counsel's performance.' [Citation.]"
(*Doolin*, *supra*, 45 Cal.4th at pp. 417–418.)

"[A] determination of whether counsel's performance was 'adversely affected' under the federal standard 'requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' [Citation.]" (*Doolin*, *supra*, 45 Cal.4th at p. 418.)

## **Proceedings**

After trial but before sentencing, defense counsel filed a notice of actual conflict of interest with the court and requested to withdraw as counsel.[8] Defense counsel was being prosecuted by the Los Angeles District Attorney's Office for misdemeanor planning and zoning and building code violations. The case was filed on July 2, 2018,

---

[8] The notice is not contained in the record, but referenced in a minute order dated April 8, 2019.

approximately one week after counsel's appointment to represent Tanks. At a hearing on the matter, the trial court elicited that Tanks had not known about counsel's pending case before the hearing and was not now willing to waive the conflict. The trial court relieved defense counsel as requested. The prosecutor asked for clarification. It was his understanding that defense counsel confirmed with the state bar that there was no reporting requirement. The prosecutor was confused as to why the notice of conflict was being filed at this juncture, after trial had completed. The prosecutor asked when it was anticipated that the matter would be resolved. Defense counsel responded that he was having his architect draw up plans to submit a coastal development permit, and that the process should take six to eight weeks.

The court stated that defense counsel appeared to have confused his duty to report to the bar with his duty to inform Tanks about the potential conflict, so that Tanks could make an informed choice about his representation. The court proposed to relieve counsel and appoint new counsel, who could investigate the potential conflict.

At a continued hearing the court relieved defense counsel and appointed new counsel. New counsel subsequently filed a motion for new trial, stating that Tanks claimed his former attorney failed to investigate the facts and available witnesses due to his attorney's conflict of interest, which arose at the outset and was not disclosed until after trial. The motion was not specific regarding

counsel's alleged failures. The prosecutor opposed the motion on the basis that there was no evidence of actual prejudice.

At the hearing on the motion for new trial, the parties submitted on their filings. The trial court reiterated that the issue arose on July 2, 2018, while the case was pending, when former counsel was prosecuted by the District Attorney for two counts of violation of planning and zoning, and two counts of violation of the building code of the Los Angeles Municipal Code regarding permitted structures on property. The case was pending throughout trial. The potential conflict was not disclosed to Tanks, the prosecutor, and the court until after the verdict.

The trial court ruled that prejudice was not presumed because Tanks had already had a full trial to verdict, and it was not a concurrent representation of potentially adverse clients. Employing the standard articulated in *Doolin, supra*, 45 Cal.4th 390, the trial court found that former counsel's representation was "full and vigorous." The court saw no "pulling of punches". Former defense counsel's "cross-examination of People's witnesses was full and vigorous and effective. And it became obvious during the trial that Mr. Cohen had visited many of the witnesses on this case, gone out himself to inspect certain locations involved in the case. [¶] And, in fact, the entire defense on this case really rested on the defendant's testimony himself." The jury either had to believe Tanks that the gun fired accidentally, or Barajas's testimony that the shooting was

21

intentional.  The jury was instructed on accident, but did not find Tanks credible, and convicted him of attempted murder.  That could not be attributed to former counsel.  Counsel did everything necessary to defend Tanks.  The trial court denied the motion.

## Analysis

Tanks's contention lacks merit.  He relies on *Harris v. Superior Court* (2014) 225 Cal.App.4th 1129 (*Harris*) and *In re Gay* (2020) 8 Cal.5th 1059 (*Gay I*), which are both readily distinguishable.

In *Harris*, Gustavo Diaz represented the defendant at the preliminary hearing.  Mr. Diaz had a conflict of interest in two respects.  First, Mr. Diaz had been arrested and was facing felony charges brought by the Los Angeles County District Attorney.  This was the same agency that was prosecuting the defendant.  Second, the same law enforcement officer had arrested both Mr. Diaz and the defendant.  Further, the arresting officer was the sole prosecution witness at the defendant's preliminary hearing.  And the arresting officer was a potential witness in proceedings against Mr. Diaz.  The appellate court held Mr. Diaz had an actual, not merely potential, conflict of interest.  (*Harris*, *supra*, 225 Cal.App.4th at pp. 1137–1144.)   Further, the court held no affirmative showing of prejudice was required to obtain a dismissal of the information.  (*Id*. at pp. 1145–1148.)

The *Harris* court held the denial of a substantial right at the preliminary hearing renders the ensuing commitment illegal and entitles a defendant to dismissal of the information. The court reasoned: "When the issue is raised in the trial court before the defendant's conviction, a challenge to counsel's conflict of interest does not depend on a showing that conflict-free counsel would have obtained a better result. ([*People v.*] *Pompa–Ortiz*[(1980)] 27 Cal.3d [519,] 529 [If the issue is raised before trial, prejudice is presumed]); *People v. Booker* (2011) 51 Cal.4th 141, 157 ['the need for a showing of prejudice depends on the stage of the proceedings at which a defendant raises the claim in a reviewing court . . .']." (*Harris, supra,* 225 Cal.App.4th at p. 1146.) No review petition was filed in *Harris.*

*Harris* does not control the outcome of our case. First, in *Harris,* the conflict of interest came to light following a preliminary hearing, not after a guilty verdict at trial. Second, in *Harris,* the defendant brought a pre-trial motion to dismiss the information, not a motion for a new trial. And third, the motion to dismiss in *Harris* was governed by the rule, applicable in that pre-trial context, that no affirmative showing of prejudice is required. Here, Tanks could obtain a new trial only by showing actual prejudice.

Except in a concurrent representation case where an actual conflict arises from the dual representation, there is no presumption of prejudice in the post-trial conflict of interest context. (See *People v. Gonzales* (2011) 52 Cal.4th 254, 309; *Doolin, supra,* 45 Cal.4th at p.420; *People v.*

23

*Ramirez* (2006) 39 Cal.4th 398, 427–428.) There was no concurrent representation in this case. Here, the trial court was required to, and did, consider whether defense counsel's conflict of interest affected his performance and whether it resulted in actual prejudice to Tanks. (*Mickens v. Taylor* (2002) 535 U.S. 162, 166; *People v. Mai* (2013) 57 Cal.4th 986, 1009–1010; *Doolin*, *supra*, 45 Cal.4th at pp. 417–421.)

In *Gay I*, the defendant filed for a writ of habeas corpus, alleging constitutionally ineffective representation from his trial counsel, Daye Shinn. The Supreme Court issued an order to show cause limited to a claim of ineffective assistance at the penalty phase.

The Supreme Court granted the petition and ordered a new penalty phase trial. (*Gay I*, *supra*, 19 Cal.4th at p. 780.) The court held that Shinn had "rendered deficient performance by inducing Gay to admit to having committed several robberies—admissions that were used against him at the penalty phase—while presenting 'little mitigating evidence' even though 'much more potentially mitigating evidence was easily accessible.' (*Id.* at p. 794.)" (*In re Gay* (2020) 8 Cal.5th 1059, 1069 (*Gay II*).)

"These deficiencies . . . could be traced in part to serious misconduct in the very foundation of the attorney-client relationship. The referee concluded that Shinn—who would later be disbarred for misappropriation of client funds in an unrelated matter (*Gay I*, *supra*, 19 Cal.4th at p. 780, fn. 5)—had used fraudulent means to induce Gay to retain him as his attorney. Visiting Gay in county jail, Shinn and

24

an associate, Marcus McBroom, urged Gay to hire Shinn, promising that a group of unidentified (and, in truth, nonexistent) Black businessmen would pay his legal fees. Shinn later directed Gay to tell the court—falsely—that his parents had paid a retainer to Shinn and would pay his legal fees. (*Id*. at pp. 781, 794.) Shinn engaged in these machinations in order to engineer his eventual appointment by the court. (*Id*. at p. 794.)" (*Gay II*, *supra*, 8 Cal.5th at pp. 1069–1070.)

"McBroom was an assistant to Dr. Fred Weaver, a psychiatrist whom Shinn hired to examine Gay's mental health. (*Gay I*, *supra*, 19 Cal.4th at pp. 783, 797–797.) [The Supreme Court] concluded that 'Shinn did not select Dr. Weaver because of his demonstrated competence,' but because 'Shinn, McBroom, and Weaver had a capping relationship pursuant to which Weaver was retained in cases in which McBroom had arranged representation by Shinn.' (*Id*. at p. 796.) Dr. Weaver accepted the assignment 'only with the understanding that the case would not be complicated and would not place demands on his time.' (*Id*. at p. 828.) Shinn did not undertake, nor did he direct Dr. Weaver to undertake, 'the type of penalty phase investigation and preparation expected of competent professionals in a capital case,' including a thorough assessment of Gay's mental health. (*Id*. at p. 796.)" (*Gay II, supra,* 8 Cal.5th at p. 1070.)

"'[A]t the time Shinn represented petitioner, Shinn labored under [an] undisclosed potential conflict of interest—

he was being investigated for misappropriation of client funds by the office of the same district attorney who was his adversary in the prosecution of petitioner.' (*Gay I, supra,* 19 Cal.4th at p. 828.) While the record did not reveal whether Shinn was influenced by this 'distraction,' [the Supreme Court] noted that the potential conflict 'contribute[d] to [its] lack of confidence in the verdict when considered with Shinn's other failings.' (*Ibid.*)" (*Gay II, supra,* 8 Cal.5th at p. 1070.)

The Supreme court summarized its conclusions: "'We are unable to put confidence in a verdict of death rendered by a jury that reaches a death penalty verdict for a defendant represented by an attorney who has defrauded the court in seeking appointment, and whose unethical conduct led directly to the retention of a mental health expert who the attorney agreed would not be called upon to do a thorough assessment of the defendant and who testified that the defendant had a sociopathic personality. Confidence in the verdict is further undermined by counsel's incompetent conduct contributing to the penalty phase jury's consideration of evidence that the defendant is a serial robber with a sociopathic personality, and by recognition that the jury did not have the opportunity to consider a substantial amount of mitigating evidence that competent counsel would have presented. We conclude there is a reasonable probability that absent counsel's numerous failings and the conflicts of interest with which he was burdened, a different penalty verdict would have been

26

reached.  We do not, therefore, have confidence in the penalty verdict reached in this case.' (*Gay I, supra,* 19 Cal.4th at pp. 829–830, fn. omitted.)" (*Gay II, supra,* 8 Cal.5th at pp. 1070–1071.)

*Gay I* differs substantially from the case at bar.  There, counsel's deficiencies were numerous and "could be traced in part to serious misconduct in the very foundation of the attorney-client relationship" (*Gay II, supra,* 8 Cal.5th at p. 1069.)  Although in both cases the attorneys were being prosecuted by the same District Attorney's office, unlike *Gay I,* in this case counsel's conflict of interest was unrelated to his representation of Tanks.  Finally, it was the combination of serious deficiencies and the conflict of interest that undermined the court's confidence in the penalty verdict in *Gay I.*  As we discuss, *post,* counsel's representation of Tanks was not marred by deficiencies.

Although Tanks claimed that former counsel failed to investigate and call witnesses, he provided no specific examples, and did not explain how he was prejudiced.  Tanks has filed a lengthy appeal, rife with arguments, and none reveals a deficiency in counsel's performance or resulting prejudice.  On this record, we cannot conclude that the trial court abused its discretion in denying the motion for mistrial.

## 2. *Marsden Motion*

Prior to trial, Tanks moved to relieve counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). On appeal, he contends that the trial court abused its discretion in denying the motion. We find no abuse of discretion.

"When a defendant seeks new counsel on the basis that his appointed counsel is providing inadequate representation . . . , the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. Substitution of counsel lies within the court's discretion. The court does not abuse its discretion in denying the motion unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel. [Citation.]" (*People v. Smith* (2003) 30 Cal.4th 581, 604.) We review a ruling on a request to relieve counsel for abuse of discretion. (*Marsden*, *supra*, 2 Cal.3d at p. 124.)

In this case, the trial court held an in camera hearing, at which Tanks was given an opportunity to explain his dissatisfaction with counsel and recount specific instances of inadequate performance. Tanks expressed concern that counsel was a private lawyer rather than a public defender.

28

The trial court explained that that was not unusual. Tanks said counsel planned to take a month away from his case to work on a different case. Counsel explained that he had a special circumstance murder trial that was starting the following week and was estimated to last two to three weeks. Tanks responded that this was counsel's second trial since his representation commenced, and he did not think counsel had adequate time to work on his case.

Tanks complained that counsel did not file a motion to suppress evidence until four months had passed. In Tanks's experience, an attorney would usually file a motion to suppress within six weeks. Tanks stated that he did not have personal problems with his attorney and "he would be a brilliant attorney if he had the chance to talk with me."

The court told Tanks that it had received a "pretty well-prepared motion to sever" from defense counsel. Tanks said he had read the motion, and agreed it was well-prepared as far as he could tell as a layperson. The motion to sever was filed on August 21. The trial court explained that it was typical for attorneys to be busy and that defense counsel was not working outside of the normal time range.

The court asked counsel to summarize counsel's work completed to date. Defense counsel stated that he was appointed to represent Tanks on May 29, 2018. At the time of the hearing he had been representing Tanks for about four months. In that time, in addition to filing the motion to suppress and the motion to sever, he had made several visits to the jail and the crime scene, met with Griffin and

communicated with her numerous times, filed a successful motion to appoint a defense investigator who was appointed on June 7, met with the investigator and delivered all discovery to him, extended a plea offer to the District Attorney that was denied, and requested that the District Attorney make a counteroffer.

The court inquired regarding counsel's decision not to file the motion to suppress at the preliminary hearing. Counsel explained that Tanks wanted a speedy preliminary hearing, but that counsel felt he needed more information so he reserved the right to file it later.

The court asked Tanks whether there was something specific he could think of that counsel had not done. Tanks indicated that he felt the proceedings were not moving fast enough, and "there are things that I have to -- that I don't understand, but that I have to get through to get where I want to be." The court set forth the basic legal process for Tanks and advised him that at the preliminary hearing defense counsel would not usually present a defense, but would cross-examine witnesses. The court also explained that there had been a continuance over Tanks's objection because he had a co-defendant whose needs had to be taken into account as well.

The court told Tanks that it believed counsel was doing everything he was supposed to do. Tanks explained that the problem was lack of communication. The court responded that in many instances counsel would be working on his case, but that he would not hear about it. The court

30

encouraged Tanks to speak with defense counsel when he had the opportunity on court days like the instant one when not much was happening.

The trial court denied the motion. The court stated that defense counsel was a good attorney, and if the court replaced him, Tanks might get someone who hand-held him a little more, but that would not be very valuable. The court assured Tanks that he could renew the motion if some new problem arose.

Tanks cites to his attorney's conflict of interest and errors that allegedly occurred at trial to support his argument, but those facts were not before the trial court or raised by Tanks at the *Marsden* hearing. The information before the court was that Tanks wanted better communication and a faster-moving trial, but that defense counsel was proceeding at a pace and performing the tasks that a reasonable attorney would perform at that stage in a trial within a normal timeframe. Although counsel could certainly have communicated more with Tanks, his communication was not atypical or unreasonable given other time constraints. Applying the *Marsden* test to this case, we find no error in denying the motion for substitute counsel. The reasons Tanks stated at the *Marsden* hearing to substitute counsel do not, taking into consideration the explanations offered by counsel, show any inadequacy of counsel or irreconcilable differences. "Accordingly, we find no basis for concluding that the trial court either failed to conduct a proper *Marsden* inquiry or abused its discretion in

31

declining to substitute counsel. [Citation.]" (*People v. Fierro* (1991) 1 Cal.4th 173, 206–207, overruled on another ground in *People v. Thomas* (2012) 54 Cal.4th 908, 941.)

### *3. Motion to Suppress*

#### <u>Proceedings</u>

Prior to trial, Tanks filed a motion to suppress evidence (the bat) discovered in a warrantless search of Griffin's apartment. In a hearing on the matter, Los Angeles Police Department Officer Erik Peña testified that, prior to the seizure, the victim identified Tanks in a photographic six-pack as the person who shot him and beat him with a bat. The officers had detained Cook shortly after the shooting. At the police station, Cook's cell phone rang repeatedly. Based on an address in Cook's text messages, the officers believed that Tanks was inside Griffin's apartment. While standing outside, Officer Peña heard voices in the apartment, which caused him to believe that Tanks was hiding inside or staying in Griffin's apartment, and that a protective sweep was necessary.

Officers knocked on the door, and Griffin answered. Officer Peña advised her that they were doing a protective sweep for Tanks. Griffin gave them permission to enter. She confirmed that Tanks had been in the apartment earlier that evening.

The officers conducted a sweep search for Tanks. They did not open drawers or search other areas where Tanks could not reasonably be hiding. In Griffin's bedroom, Officer Peña observed a black aluminum bat leaning against the bed frame next to the dresser. Griffin told the officers that Tanks had the bat in his possession when he arrived at the apartment earlier that day.

Officer Peña testified that Griffin gave the officers both verbal and written permission to enter the apartment. Detective Mario Gonzalez provided Griffin a consent form, which she executed after the sweep was conducted. Officer Peña did not bring the written consent form to the hearing. Officer Peña was not asked whether Griffin had signed a property receipt form for the bat removed from her apartment, and did not testify regarding a property receipt.

Griffin also testified at the hearing. Griffin and Tanks had been dating for 15 years, and had lived in the apartment together for 8 years. On the night of the shooting, approximately 10 officers knocked on her door. When she answered, the officers asked if Tanks was in the apartment, and she responded that he was not. The officers asked her to step outside. They did not ask her permission to enter the apartment and she did not give them signed consent to enter the apartment. She told them that they did not have permission to remove anything from the apartment. She was told to sign a piece of blank paper in acknowledgment that they were taking an item out of the apartment. The officer clarified that it was not permission, just

33

acknowledgment.  Griffin had the piece of paper, but she did not bring it to the hearing.

The trial court asked the prosecutor whether she had a copy of the document that Griffin signed.  The prosecutor responded that she did not, because the form was not in the discovery packet she received, but she offered to request the document from the Los Angeles Police Department.

Defense counsel argued that Griffin was adamant that she did not consent to the warrantless search.  With respect to the signed document, counsel said, "I don't know exactly what it was.  It sounds like Ms. Griffin thought it was perhaps a property receipt or something for the bat that was taken.  It seems odd that they would ask her to sign a consent after the search has been completed, but we don't have the benefit of that document, so I'll submit it."

The prosecutor argued that performance of a protective sweep is an exception to the warrant requirement.  The police had reason to believe that a suspect in a shooting would be present at the specific location.  The bat was found in plain view in the course of the protective sweep.  The prosecutor asserted that the protective sweep, the seizure of the bat, and the consent to search were all valid.

The trial court ruled, "The court's going to deny the 1538.5 motion.  The court finds that the testimony of Officer Peña was credible testimony and it provided at least two bases to support the seizure of the bat, one being the protective sweep and the exigency involved in that and two being the consent and so I'm going to deny the motion."

## Analysis

Tanks argues that the search of Griffin's apartment was not justified because Griffin never gave written consent. Alternatively, he asserts that the search was not justified as a protective sweep, as there were no exigent circumstances. We conclude that Officer Peña's testimony that Griffin gave verbal consent is substantial evidence that supports the trial court's ruling.

### *Standard of Review for a Motion to Suppress*

"'An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles. [Citations.] [¶] In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] "The [trial] court's resolution of each of these inquiries is, of course, subject to appellate review." [Citations.] [¶] The court's resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law,

35

. . . is also subject to independent review.' (*People v. Williams* (1988) 45 Cal.3d 1268, 1301, abrogated on another ground as recognized in *People v. Abilez* (2007) 41 Cal.4th 472, 519; see *People v. Ayala* (2000) 23 Cal.4th 225, 255.) All presumptions favor the trial court's exercise of its power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence, and draw factual inferences, '"and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence."' (*People v. Leyba* (1981) 29 Cal.3d 591, 596–597, quoting *People v. Lawler* (1973) 9 Cal.3d 156, 160 (*Lawler*).)" (*People v. Werner* (2012) 207 Cal.App.4th 1195, 1203 (*Werner*).)

"Based upon its factual findings, the trial court has the duty to determine whether 'the search was unreasonable within the meaning of the Constitution.' (*Lawler, supra*, 9 Cal.3d at p. 160.) California courts measure the reasonableness of the search against federal constitutional standards. (Cal. Const., art. I, § 28, subd. (d); see *People v. Woods* (1999) 21 Cal.4th 668, 674.)" (*Werner, supra*, 207 Cal.App.4th at p. 1204.)

*Griffin Consented to Officers Entering The Apartment*

"'The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without

36

prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." [Citation.]' [Citation.]" (*Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1224.)

"[An] established exception to the warrant requirement is when consent is given by one authorized to give it." (*People v. Superior Court* (*Chapman*) (2012) 204 Cal.App.4th 1004, 1011–1012; see also *United States v. Rubio* (9th Cir.1983) 727 F.2d 786, 797 ["Once consent has been obtained from one with authority to give it, any expectation of privacy has been lost"].)

In the opening brief, Tanks suggests that the prosecutor's argument and the court's ruling were focused on Officer Peña's testimony that the officers obtained Griffin's written consent. He contends that, at trial, Officer Peña inconsistently testified that Griffin signed a property receipt, not a consent form. He asserts that the officer's conflicting statements regarding whether the form was a consent form or a property receipt demonstrate that the motion to suppress was erroneously denied and that there was no valid consent to enter the apartment or search it.

Tanks misconstrues Officer Peña's testimony. When the prosecutor asked, "Did Deborah sign a property receipt when you removed [the bat] from her residence?," Officer Peña responded, "Yes." He was not questioned regarding the purported written consent to search the apartment by either party at trial. Defense counsel did not bring the alleged

37

inconsistency in the officer's testimony to the trial court's attention.

Contrary to Tanks's assertions, neither the prosecutor's argument nor the trial court's ruling was limited to Griffin's written consent. The trial court found Officer Peña's testimony credible, and credited Officer Peña's testimony with respect to Griffin giving verbal consent. Credibility is an issue decided by the finder of fact. Officer Peña's testimony that he personally heard Griffin give verbal consent to the sweep of the apartment is substantial evidence that Griffin consented to the search.

*The Bat That Was Seized Was in Plain View*

"[W]hether a lawful entry and search is based upon exigent circumstances or consent, the law is clear that any incriminating evidence observed in plain view may be seized. [Citations.] The United States Supreme Court has said, 'The plain-view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity. [Citations.] The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item first-hand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy.' (*Illinois v. Andreas* (1983) 463 U.S. 765, 771; see also *Katz v.*

*United States* (1967) 389 U.S. 347, 351 ['What a person knowingly exposes to the public, even in his own home . . . is not . . . subject [to Fourth Amendment] protection'].)" (*Chapman, supra,* 204 Cal.App.4th at p. 1012–1013.)

Here, Officer Peña testified that the bat the police seized was in plain view when he entered Griffin's bedroom to look for Tanks.  This is substantial evidence to support the trial court's finding that the bat was visible to the officer and not in an area that he was unauthorized to search.  Moreover, Officer Peña had probable cause to suspect that the bat was connected to criminal activity.  Barajas was beaten with a bat and had positively identified Tanks as his assailant.  Cook, who was found with the gun in his possession and whose cell phone texts with Tanks included the address for Griffin's apartment, had also identified Tanks as the assailant.  Griffin confirmed that Tanks had been in the apartment earlier that evening when she gave officers permission to enter and look for Tanks.  Given these facts, the officer had probable cause to believe that the bat belonged to Tanks and that he had used it to beat Barajas.

The trial court did not err in denying Tanks's motion to suppress, given evidence that: Griffin gave officers permission to enter the apartment; the officers had probable cause to suspect that the bat was connected to the attempted murder; and the bat was discovered in plain view.

## *4. Admission and Exclusion of Prior Crimes Evidence*

Tanks contends that the trial court erred by (1) excluding evidence of Cook's 2007 felony conviction on the basis that it was not a crime of moral turpitude; (2) admitting evidence of Tanks's 2006 conviction for grand theft auto, which was too remote to be admissible; and (3) excluding evidence of Barajas's 2001 and 2002 felony convictions and his illegal re-entry into the United States. We conclude that the trial court's determinations regarding the admission and exclusion of evidence for purposes of impeachment were not an abuse of discretion.

### **Legal Principles**

Prior felony convictions are generally admissible to impeach a witness's credibility.  (Cal. Const., art. I, § 28, subd. (f)(4); Evid. Code, § 788; *People v. Beagle* (1972) 6 Cal.3d 441, 453.)  "Misdemeanor convictions themselves are not admissible for impeachment, although evidence of the underlying *conduct* may be admissible subject to the court's exercise of discretion.  [Citation.]" (*People v. Chatman* (2006) 38 Cal.4th 344, 373.)  "'[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude.  Beyond this, the latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.'

[Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 931 (*Clark*).)

"When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify. [Citations.]" (*Clark, supra*, 52 Cal.4th at p. 931.) "Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude. [Citation.] As [the Supreme Court has] advised, 'courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' [Citation.]" (*Id.* at pp. 931–932.) "[A] misdemeanor offense or other misconduct not amounting to a felony is less probative of moral turpitude or dishonesty than is a felony. [Citation.]" (*Id.* at p. 932.)

"Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion. [Citations.]" (*Clark, supra*, 52 Cal.4th at p. 932.)

41

## Cook's 2007 Felony Conviction

*Proceedings*

Tanks sought to impeach Cook with his 2007 felony conviction for driving while barred, habitual offender in Iowa.  The trial court reviewed Cook's probation report, and noted that his record appeared to contain only out-of-state misdemeanors that did not involve moral turpitude.  Defense counsel noted that the 2007 conviction appeared to be a felony.

The court indicated that the felony would only be admissible if it involved moral turpitude, and the court did not know if the Iowa felony qualified as a crime of moral turpitude.  The trial court noted that Cook's testimony should be finishing that day.  The trial court proposed that if Cook's testimony did not conclude, the parties could research the issue to determine whether the conviction was for a crime of moral turpitude.  If Cook's testimony did conclude and the conviction was for a crime of moral turpitude, the parties could stipulate to the conviction after the fact.  Defense counsel agreed that this was a satisfactory solution.

On cross-examination, defense counsel elicited that Cook was given a sentence of only nine years for three offenses—the attempted murder of Barajas and two counts of drug trafficking.

The next day, the court informed the parties that it had researched the matter and although driving while

42

barred, habitual offender, was a felony in Iowa, it did not appear to be a crime of moral turpitude. Unless defense counsel could demonstrate otherwise, the court did not intend to admit the 2007 conviction. The court noted that "You've got plenty of moral turpitude to talk about[,]" as Cook had admitted to being convicted of attempted murder and to dealing drugs.

*Analysis*

Tanks contends that the trial court erred by concluding that Cook's 2007 felony conviction for driving while barred, habitual offender, was inadmissible for impeachment because it was not a crime of moral turpitude. Tanks cites to *People v. Clair* (1992) 2 Cal.4th 629 (*Clair*) for the proposition that all felonies are admissible for impeachment purposes. *Clair* is inapposite. In *Clair*, the Supreme Court held that the trial court did not abuse its discretion by refusing to admit a witness's conviction of a crime of moral turpitude for impeachment purposes pursuant to Evidence Code section 352. (*Id*. at pp. 653–656.) *Clair* did not hold that every felony conviction is admissible for impeachment.

Moreover, Tanks could not have suffered prejudice. The jury had been informed that Cook had been convicted of attempted murder and two counts of drug trafficking for a sentence of only nine years, and would understand that in light of this leniency, Cook had a strong motivation to lie.

43

## Tanks's 2006 Conviction

*Proceedings*

At trial, the prosecution sought to admit evidence of Tanks's 2006 conviction for grand theft auto for purposes of impeachment.  The prosecutor argued that grand theft auto was a crime of moral turpitude.  Defense counsel countered that the conviction was over ten years old, so "not particularly relevant."

The court stated that "10 years is not a brightline rule", and noted that "he does have several contacts here, some convictions for drug offenses, couple from Indiana.  So the theft offense is a felony, from 2006.  I don't find it to be too remote."  The trial court allowed the conviction to be admitted for impeachment purposes.

Subsequently, the trial court excluded Griffin's 2006 misdemeanor conviction as too remote.  The court stated, "I'm not convinced that loitering for the purposes of soliciting prostitution is a moral turpitude offense."  It ruled:  "I do think that it's too remote, and I'll just -- I'll leave it at that.  I'll leave my other comments unsaid.  But it's too remote."

Tanks testified that he moved into the apartment building "in 2008 after I got off parole."  He admitted that he was convicted of stealing a semi tractor-trailer in 2006.

Defense counsel examined Tanks regarding his use and sale of narcotics.  Tanks testified that he used drugs, but did not sell them.  Counsel asked if he knew that he had been

44

convicted of possession for sale of a controlled substance. Tanks admitted that he knew the conviction was on his record, but asserted that he had not served a prison term, and that the conviction was 13 or 14 years old.

*Analysis*

Tanks contends that the trial court abused its discretion by admitting his 2006 conviction for grand theft auto, which was over 10 years old and therefore presumptively too remote in time. He argues that the trial court did not rule consistently in this regard—the court excluded Griffin's 2006 conviction for loitering for purposes of soliciting prostitution as too remote and should have excluded his 2006 conviction for the same reason.

Tanks relies on *People v. Pitts* (1990) 223 Cal.App.3d 1547 (*Pitts*), which he misconstrues to hold that a conviction greater than 10 years old is presumptively too remote to be admitted. In *Pitts*, the defendant argued that the court did not exercise discretion in excluding a witness's prior conviction "but, instead, excluded it on the basis of an inflexible rule of the trial court's own making that any crime more than 10 years old cannot be used for impeachment." (*Id.* at p. 1554.) The *Pitts* court stated: "As we noted in *People v. Burns* (1987) 189 Cal.App.3d 734, 738, '[t]here is no consensus among courts as to how remote a conviction must be before it is too remote. [Citation]' In our view establishing 10 years as the presumptive cut-off date for

45

prior convictions *is* an exercise of discretion.  It is preferable that the trial court have in mind a presumptive standard of remoteness rather than have no concept of remoteness and issue inconsistent rulings each time the issue comes up." (*Ibid*.)  The court held that the trial court properly exercised its discretion.  (*Ibid*.)

*Pitts* does not mandate a 10-year presumptive cut-off date beyond which a prior conviction may not be used as impeachment evidence.  It holds that an individual court's determination that there is a presumptive cut-off date is itself an exercise of discretion.  In this case, it appears that the trial court determined that a 16-year-old conviction is presumptively too old to be admitted, but that this cut-off was not a "brightline rule."   In Griffin's case, there was no reason for the court to deviate from the presumption—the crime was a misdemeanor and the court noted that it was doubtful that loitering for purposes of soliciting prostitution was a crime of moral turpitude.  Tanks's situation was different—he was convicted of a felony that was classified as a crime of moral turpitude.  (See *People v. Wheeler* (1992) 4 Cal.4th 284, 289 [theft "reflects dishonesty and is a crime involving moral turpitude"].)  The court additionally noted that "[Tanks] does have several contacts here, some convictions for drug offenses, couple from Indiana."

In our view, the court properly exercised its discretion in making these rulings.  It acknowledged in both instances that a conviction of over 16 years of age was remote, but distinguished between the two convictions based on the

46

specific circumstances of each. In Griffin's case, the conviction was for a misdemeanor that was not likely a crime of moral turpitude—i.e. the conviction was likely inadmissible because it was not relevant to Griffin's credibility. In Tanks's case, the conviction was for a felony of moral turpitude—i.e. the conviction was presumptively admissible—and Tanks also had a history of criminal activity that the court found significant.

Regardless, in light of the overwhelming evidence of Tanks's guilt in this case, he was not prejudiced by admission of the 2006 grand theft auto conviction. Both Cook and Barajas identified Tanks as the shooter and described the shooting as intentional. Although Cook's credibility may have been questionable due to his plea agreement, the evidence corroborated his version of events. Tanks admitted to threatening Barajas with the gun, and scaring him by firing a shot. He claimed that the subsequent shots were accidental but did not disavow that the gun was in his physical possession when it was fired. Cook stated that before he left, Tanks took a black aluminum bat from him. Barajas testified that Tanks beat him with a bat. Officers discovered a black aluminum bat in Griffin's apartment that evening, and Griffin admitted that Tanks had arrived at the apartment with the bat earlier that afternoon. Tanks has not demonstrated prejudice.

## Barajas's Narcotics Convictions and His Purported Illegal Re-Entry into the United States

*Proceedings*

Tanks moved to admit evidence for impeachment of Barajas's prior convictions and re-entry into the United States. The trial court reviewed Barajas's RAP sheet and noted that the only convictions for moral turpitude were three felony convictions for transport or sale of narcotics (§ 11352) in 2001, 2002, and 2007.[9]

The prosecution argued that the convictions were remote in time. Defense counsel stated that Tanks told him Barajas had recently been deported and re-entered the country. Counsel had not seen any evidence to support Tanks's claim, and did not know if re-entering the country following deportation was a crime of moral turpitude. The court responded that, absent evidence of Barajas's purported deportation and re-entry, it could not be admitted.

Defense counsel then argued that all three of the prior felony convictions should be admitted. Counsel asked if the court had seen any misdemeanors involving moral turpitude on Barajas's RAP sheet. The court responded that there were "a couple", but that "those would have to be investigated, and you have to find the witnesses and back up

---

[9] Barajas's RAP sheet was listed under another name. There was some question regarding whether the name Barajas was an alias.

those claims." Defense counsel stated that he would be satisfied with the felony narcotics convictions. The court admitted the 2007 felony conviction, but excluded the 2001 and 2002 convictions as too remote.

Defense counsel added that he had a short conversation with Barajas, who indicated that he was deported about two years before trial. The court asked if either of the parties knew the circumstances of Barajas's re-entry, specifically if it was legal or not. The parties stated they did not. The court then asked if the parties knew whether re-entering illegally was a crime of moral turpitude. The parties stated they did not. The court advised the parties that they could take the issue up at the next break. There was no further discussion about the issue.

Tanks testified that Barajas was an associate of the Blythe Street gang and paid them to sell drugs in Tanks and Barajas's neighborhood. He also testified that Barajas was a "trick" or a John, which meant all of Barajas's girlfriends were prostitutes.

On re-direct, counsel questioned Tanks regarding his statements about Barajas:

"[Defense Counsel:] When you described Mr. Barajas as being like the Mexican Mafia, what did you mean by that?

"[Tanks:] Exactly what it means. Like I said, when he -- first time he got deported, he came back, he was normal. He was okay. But last time he got deported, he came back and he told me himself he was trying to get into the Mexican Mafia. He couldn't be seen fussing with the Blacks."

49

The prosecutor objected on hearsay grounds. The trial court ruled: "It's already been gone over. It's asked and answered. The answer will stop there."

*Analysis*

Tanks contends that the trial court abused its discretion by excluding evidence of Barajas's convictions in 2001 and 2002 as too remote, and by excluding evidence of his illegal re-entry into the United States.

With respect to the 2001 and 2002 convictions, Tanks argues that the trial court did not apply its cut-off date for convictions uniformly. Tanks made no such argument before the trial court or in his opening brief. Regardless, as we have discussed, the trial court properly exercised its discretion in ruling that Griffin's 2006 conviction was too remote to be admissible. It follows that, absent some other compelling reason for admitting Barajas's 2001 and 2002 convictions, as in the case of Tanks's 2006 conviction, the trial court properly exercised its discretion to find Barajas's even older convictions to be too remote.

With respect to Barajas's alleged deportation and re-entry into the United States, the trial court did not abuse its discretion when it ruled that evidence of Barajas's immigration status could not be admitted absent some proof of its existence. The only evidence offered was hearsay, which is inadmissible, absent an exception to the hearsay rule. (Evid. Code, § 1200, subd. (b).) Tanks does not argue

that he offered admissible proof of Barajas's immigration status.  It is irrelevant whether it is a crime of moral turpitude to re-enter the country after deportation because there was no admissible proof that Barajas was deported or re-entered.

Finally, Tanks cannot show prejudice.  He personally testified that Barajas was deported twice and re-entered the country following each deportation.  The jury was not admonished to disregard this testimony.  Tanks also testified that Barajas was an associate of a criminal street gang, dealt drugs, and dated prostitutes.  Finally, Barajas was impeached with his 2007 conviction.  The jury was offered ample information for it to question Barajas's credibility and testimony.

## 5. Admission of Evidence of the Victim's Mental State

### Proceedings

On re-direct examination, the prosecutor asked Barajas whether he was fearful of testifying.  Barajas confirmed that he was afraid.  After Barajas's testimony that day, the court inquired whether Barajas could be excused and released from subpoena.  The prosecutor stated that he might need to recall him, and the trial court excused Barajas, but subject to recall.

Two days later, the prosecutor informed the court and defense counsel that Barajas had texted Detective Goossens

51

the prior evening. Barajas was very concerned because Griffin had come to his apartment door that morning. She had been harassing him for the prior six months.

The prosecutor indicated that he planned to recall Barajas to testify regarding the intimidation. The court stated that it would permit Barajas to testify briefly and instructed the prosecutor to tailor the questioning to confine it to Barajas's state of mind as a witness.

Following a recess shortly thereafter, outside the presence of the jury, the court noted on the record that Barajas was not available to testify as a witness and that the prosecution instead sought to admit Detective Goossens's testimony regarding Barajas's state of mind after testifying.

Defense counsel objected to the statements as "untimely." When the court asked for clarification, counsel explained, "[H]e is not available as a witness anymore. Although that's not one of the requirements -- I feel like we have already touched on this, perhaps on [Evidence Code section] 352 grounds as well. He was asked about it during his testimony, and now we are going to allow hearsay statements to -- at this late stage. I think it's untimely, so I'm objecting."

The trial court ruled that the Detective Goossens's proffered testimony fell within the hearsay exception in Evidence Code section 1250, because the state of mind of the declarant, Barajas, was at issue. The court stated that it would give a limiting instruction, and the detective's

testimony would be brief and limited to "the effect on Mr. Barajas and how he felt about testifying."

At the beginning of Detective Goossens's testimony, the trial court instructed the jury that Detective Goossens's testimony was hearsay and would normally not be admitted. The court explained that the testimony was relevant to Barajas's state of mind only, and was not being admitted to show that the events in Barajas's statements actually occurred.

Detective Goossens testified that Barajas had contacted him that morning, and the detective had interviewed him at the District Attorney's office. Barajas told the detective that: Griffin had been taking photos of him when she passed him on the street in front of the apartment building. Griffin also called him a snitch and yelled out "Snitch!" so other residents could hear her. On one occasion she threw a water bottle at him. Griffin would also bump Barajas in the hallway, use profane language, and tell him that he should go back to Mexico. Griffin did this in front of Danielle Wortham, Barajas's fiancé, and her children. Detective Goossens added that Barajas was "visibly shaken" during the interview: he stammered, and he had tears in his eyes. He told Detective Goossens that he wanted to stay at the courthouse because he was afraid to go home.

Detective Goossens tried to locate Barajas before he was scheduled to testify again, but was unable to reach him by phone or text. On cross-examination, Detective Goossens testified that Barajas had asked if could stay near the

District Attorney's office that day. When the detective discovered Barajas was not at the District Attorney's office, he tried to contact Barajas to make sure that he had left the area voluntarily. Barajas had been in contact with victim assistance for relocation assistance, but had not relocated yet.

After Detective Goossens testified, the trial court again admonished the jury that it was to consider the evidence only with respect to Barajas's state of mind, and not consider it as evidence that any of the events actually occurred.

### **Legal Principles**

Evidence Code section 1250, subdivision (a)(1), provides that hearsay statements reflecting an existing state of mind of the speaker are admissible for the limited purpose of proving the declarant's state of mind. (*People v. Noguera* (1992) 4 Cal.4th 599, 621 (*Noguera*).) But this state of mind exception applies only if the declarant's state of mind is relevant to a disputed issue at trial. (*Ibid*.) A trial court errs by admitting a murder victim's out-of-court statement of fear of the defendant when the victim's state of mind is not at issue. (*Ibid*.) "'[A] victim's prior statements of fear are not admissible to prove *the defendant's* conduct or motive (state of mind). If the rule were otherwise, such statements of prior fear or friction could be routinely admitted to show that the defendant had a motive to injure or kill.' (*People v. Ruiz* (1988) 44 Cal.3d 589, 609.) (*People v. Flores* (2020) 9

54

Cal.5th 371, 410–411 (*Flores*).) "'"[A] victim's out-of-court statements of fear of an accused are admissible under [Evidence Code] section 1250 only when the victim's conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant."' [Citations.]" (*Noguera, supra,* 4 Cal.4th at pp. 621–622.)

The erroneous admission of statements under Evidence Code section 1250 is subject to harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Flores, supra,* at p. 411.) Error is harmless if "[i]t is not reasonably probable the jury would have reached a different result had it not heard [the] evidence." (*Ibid.*)

### Analysis

Tanks argues that Detective Goossens's testimony should not have been admitted under Evidence Code section 1250 because Barajas's state of mind was not at issue. He further argues that, even if admissible under Evidence Code section 1250, the trial court should have excluded the testimony as distracting to the jury, irrelevant, and unduly prejudicial under section 352. Tanks asserts that the admission of this evidence violated his due process rights and prevented him from receiving a fair trial. We conclude that the trial court erred in admitting Detective Goossens's testimony, but that the error was harmless.

Preliminarily, we disagree with the People's assertion that Tanks has forfeited the argument that the detective's

testimony was hearsay for failure to specifically raise it below.  Defense counsel expressly stated "[Barajas] was asked about it during his testimony, and now we are going to allow *hearsay statements* to [be admitted] at this late stage." The trial court ruled that the evidence was admissible under Evidence Code section 1250, which is an exception to the hearsay rule.  The parties and the court were aware of the hearsay issue and had the opportunity to address it.  The issue was not forfeited.

We agree with Tanks that Barajas's mental state was not at issue in this case.  The jury had only to decide whether the shooting was intentional or accidental, which depended on Tanks's state of mind, not Barajas's conduct or mental state.

We conclude, however, that the error in admitting the statements was harmless.  It is not reasonably probable the jury would have reached a different result had it not heard evidence that Barajas was afraid to testify.  (See *Watson*, *supra*, 46 Cal.2d at p. 836.)  The jury was instructed immediately before and after Detective Goossens testified that his statements were relevant to Barajas's state of mind only, and were not being admitted to show that the events actually occurred.  We presume that the jury understood and followed the trial court's instructions.  (*People v. Lopez* (2020) 46 Cal.App.5th 505, 525 ["[j]urors are presumed to follow the instructions they are given"]; see also *People v. Holt* (1997) 15 Cal.4th 619, 662.)  Moreover, as defense counsel noted, Barajas had already testified that he was

fearful of testifying, so the jury was already aware of his state of mind.

## 6. Delay in Providing Exculpatory Evidence

### Proceedings

*Barajas*

At the hearing on admission of evidence of Barajas's prior convictions, the trial court reviewed Barajas's RAP sheet. Defense counsel asked if the court had seen any misdemeanors involving moral turpitude on the RAP sheet. The court responded that there were "a couple", but that "those would have to be investigated, and you have to find the witnesses and back up those claims." Defense counsel stated that he would be satisfied with admission of the felony convictions. The court stated, "If you want discovery on any of the other potentially moral turpitude offenses, you can ask [the prosecutor] for that." Defense counsel responded, "We can ask for discovery. This is the first time it's been mentioned to me . . . ."

Defense counsel added that he had a short conversation with Barajas, who indicated that he was deported about two years before trial. He then stated, "I asked for RAP sheets in discovery. I got a list of crimes regarding a witness by the name of Mr. Varga. I wasn't aware until I -- I suspected there was RAP information; I

57

didn't receive it. I still haven't received it, like in written form. I just got information."

*Cook*

At the hearing on admission of evidence of Cook's prior convictions, the trial court reviewed Cook's probation report. Defense counsel stated, "My experience is typically the prosecution provides the RAP information, prior convictions, and sometimes -- I don't see it -- sometimes it's just shared with the judge. So to the extent that the District Attorney's office, a government agency, are probably in a better position to find out more information about that conviction than I am --" The court interrupted, "The one thing probation does very well is providing information on prior offenses. So I think we have a thorough look at Mr. Cook's background here from the probation report. So I feel comfortable making my decision based on that."

### Analysis

Based on the above hearing testimony, Tanks contends the prosecution violated its disclosure obligations under section 1054.1. Tanks further claims this statutory violation infringed on his federal constitutional rights to due process of law and a fair trial, in contravention of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

58

Tanks argues the prosecution was not in statutory compliance because it did not provide Barajas's RAP sheet and provided no information regarding the fact that Barajas had been deported for his crimes and re-entered the country illegally. Tanks also complains that the defense was provided with Cook's probation report rather than his RAP sheet. Tanks argues that if he had had Barajas's RAP sheet he could have called witnesses to testify to Barajas's misdemeanor crimes of moral turpitude and his violation of federal immigration laws. Tanks admits "[t]he delayed disclosure was more pronounced and prejudicial with respect to Barajas [than Cook] . . . However, there was a pattern of withholding exculpatory evidence in this case."

*Section 1054.1*

"Under section 1054.1, prosecutors are required to disclose any exculpatory evidence and any relevant written or recorded statements of witnesses or reports of the statements of witnesses whom they intend to call at trial. (§ 1054.1, subds. (e), (f).)" (*People v. Morrison* (2004) 34 Cal.4th 698, 713 (*Morrison*).)

Tanks admits that he failed to request a continuance, which is fatal to his contention on appeal. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1103.) "'It is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would

59

not have cured the harm.' [Citations.]" (*Ibid*.) The issue is forfeited.

### *Fourteenth Amendment and Brady v. Maryland*

"Under the Fourteenth Amendment's due process clause, prosecutors must disclose evidence to a criminal defendant when it is "'both favorable to the defendant and material on either guilt or punishment." [Citations.] Evidence is "favorable" if it hurts the prosecution or helps the defense. [Citation.] . . . Evidence probative of a testifying witness's credibility, including the potential for bias, is evidence favorable to the accused. (See *United States v. Bagley* (1985) 473 U.S. 667, 676.)" (*Morrison, supra,* 34 Cal.4th 698, 714.)

"Evidence is 'material' 'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.' [Citations.] The requisite 'reasonable probability' is a probability sufficient to 'undermine[] confidence in the outcome' on the part of the reviewing court. [Citations.] It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.] Further, it is a probability that is, as it were, 'objective,' based on an 'assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision,' and not dependent on the 'idiosyncracies of the particular

decisionmaker,' including the 'possibility of arbitrariness, whimsy, caprice, "nullification," and the like.' [Citation.]" (*In re Sassounian* (1995) 9 Cal.4th 535, 544–545.)

Evidence of the conduct underlying Cook's misdemeanor convictions was not material. The trial court reviewed Cook's probation report, and concluded that his record appeared to contain only out-of-state misdemeanors that did not involve moral turpitude. The conduct underlying a misdemeanor conviction is inadmissible if the offense does not involve moral turpitude. (See *Clark*, *supra*, 52 Cal.4th at p. 931 ["'the admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude'"].) There is no reasonable probability that disclosure of inadmissible evidence would have affected the outcome of the trial.

Nor was evidence of the conduct underlying Barajas's misdemeanor convictions material. As we discussed, ante, the jury was presented with overwhelming evidence of Tanks's guilt. The jury did not find Barajas's 2007 conviction for a felony involving moral turpitude sufficient to overcome the evidence. We cannot conclude there was a reasonable probability that admission of the conduct underlying his misdemeanors would have produced a different result.

## 7. *Instructional Error*

Tanks contends that the trial court erred by not instructing the jury that (1) Cook was an accomplice as a matter of law whose testimony must be corroborated and viewed with caution, (2) Tanks could be found guilty of the lesser offense of attempted voluntary manslaughter under a heat of passion theory, and (3) Tanks acted in self-defense. We agree with Tanks that the trial court had a sua sponte duty to instruct the jury that Cook was an accomplice as a matter of law, whose testimony was insufficient to support a guilty finding if uncorroborated.  The error, however, was harmless, in light of the other substantial evidence of Tanks's guilt presented at trial.  We reject Tanks's other claims of instructional error, as there was insufficient evidence to support instructions on heat of passion and self-defense.

### Legal Principles

"'A trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." [Citation.]' . . ." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824; see *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)  This obligation includes the duty to give instructions on lesser included offenses, if there is substantial evidentiary support for them.  (*Breverman, supra,* at p. 160.)  A trial court has a

sua sponte duty to instruct on an affirmative defense "'if it appears the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.' [Citation.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 469 (*Boyer*); see also *People v. Martinez* (2010) 47 Cal.4th 911, 908.) We review de novo the claim that a trial court failed to properly instruct the jury on the applicable principles of law. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

In determining whether substantial evidence exists to support an instruction, trial courts should not usurp the jury's function of evaluating the credibility of witnesses. (*Breverman, supra,* 19 Cal.4th at p. 162.) In the context of lesser included offenses, substantial evidence means "'"evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]"'" that the lesser offense, but not the greater, was committed. [Citations.]" (*Ibid.*) Speculation is insufficient to require the giving of an instruction on a lesser included offense. (*People v. Mendoza* (2000) 24 Cal.4th 130, 174.)

"[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836]. A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause,

63

including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*Breverman, supra*, 19 Cal.4th at p. 178.)

### **Accomplice Testimony**

"In California, '[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense. . . .' (§ 1111.) For purposes of this rule, an 'accomplice' is 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' (*Ibid*.) 'This definition encompasses all principals to the crime [citation], including aiders and abettors and coconspirators. [Citation.]' (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90.) . . . [L]iability as an aider and abettor requires proof that the person in question 'aid[ed] or promote[d] the perpetrator's crime with knowledge of the perpetrator's unlawful purpose and an intent to assist in the commission of the target crime.' (*People v. Williams* (2008) 43 Cal.4th 584, 637, italics omitted.) . . . [W]hether a witness is an accomplice is a question of fact for the jury unless no reasonable dispute exists as to the facts or the inferences to be drawn from them. (*People v. Valdez* (2012) 55 Cal.4th 82, 145–146 (*Valdez*).)" (*People v. Manibusan* (2013) 58 Cal.4th 40, 93.) The trial court has a sua sponte

duty to instruct the jury to view the testimony of accomplices with caution and to instruct that, if the jury is to rely on accomplice testimony, the testimony must be corroborated. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303–304 (*Gonzales*); *People v. Brown* (2003) 31 Cal.4th 518, 555.)

In this case, Cook and Tanks were charged together. Cook pleaded no contest to attempted murder and testified against Tanks as part of a plea bargain. Tanks contends that, having pleaded no contest to the identical crime, Cook was an accomplice as a matter of law, and the trial court had a sua sponte duty to instruct the jury that Cook's testimony required corroboration and should be viewed with caution.

The People argue that the duty to instruct does not arise in every case where the witness pleads no contest to the same crimes with which the defendant is charged. The cases the People rely upon are distinguishable.

In *People v. Coffman and Marlow* (2004) 34 Cal.4th 1 (*Coffman*), the defendants were charged with, and convicted of, murder, kidnapping, kidnapping for robbery, robbery, residential burglary, and forcible sodomy. (*Id.* at p. 16.) They argued that the trial court erred by failing to instruct that two witnesses—one who pleaded guilty to falsely imprisoning the victim and another who was convicted of receiving property that was stolen from the victim—were accomplices whose testimony required corroboration and should be viewed with caution. (*Id.* at p. 105.) The Supreme Court held that the trial court did not err because, although the two witnesses suffered convictions for their roles in the

65

crimes against the victim, there was no evidence in the record to support the finding that either witness aided, abetted, or otherwise facilitated any of the defendants' criminal actions with the requisite intent.  (*Id.* at p. 105.)

In *People v. Riggs* (2008) 44 Cal.4th 248 (*Riggs*), the trial court refused to instruct the jury that a witness who had pleaded guilty to the same crime the defendant was charged with was an accomplice as a matter of law.  (*Id.* at p. 312.)  The trial court reasoned that the jury could interpret the instruction to foreclose the defendant's alibi defense, which placed the witness and the defendant together in a location other than the crime scene on the day the crime was committed.  (*Ibid.*)  Our Supreme Court affirmed, explaining that "while it certainly would be highly irregular for [the witness] to have pleaded guilty to the murder when she was in fact uninvolved, for the trial court to have instructed the jury she *was* [at the location of the crime] when [the victim] was killed *as a matter of law* would have constituted a finding of fact on an issue that was for the jury to decide." (*Id.* at p. 313.)

There are no such circumstances in this case.  Unlike the witnesses in *Coffman*, who were not convicted of crimes identical to the defendants in that case, Cook was charged with attempted murder in connection with the same attempted murder for which Tanks was tried.  Cook pleaded no contest to the crime, and testified against Tanks in exchange for a more lenient sentence.  Cook testified that he gave Tanks a loaded gun, watched Tanks shoot Barajas

66

multiple times, and observed Tanks walking toward the victim with a baseball bat.  From these facts, a jury could reasonably conclude that Cook shared Tanks's intent to kill Barajas.  The only evidence that Cook did not share Tanks's state of mind was Cook's self-serving testimony that he did not know what Tanks had planned.  The instant case also differs from *Riggs*, as an instruction that Cook was an accomplice as a matter of law would neither interfere with a potential defense nor necessarily decide an issue that was for the jury to determine.  We conclude that the trial court erred by not instructing the jury under CALCRIM No. 335 that Cook was an accomplice, whose testimony required corroboration and should be viewed with caution.

That error was harmless, however.  "'A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record.' (*People v. Lewis* (2001) 26 Cal.4th 334, 370.)" (*Gonzales*, *supra*, 52 Cal.4th at p. 303.)  "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense." (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271; CALCRIM No. 335.)  Corroborating evidence is "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (*People v. Fauber* (1992) 2 Cal.4th 792, 834.)

Here, sufficient corroborating evidence supported Tanks's conviction for attempted murder.  Barajas testified

that he was Tanks's neighbor and knew him well. He identified Tanks as the person who shot and beat him in an attempt to kill him. We decline Tanks's invitation to make our own assessment of Barajas's credibility. (See *Breverman, supra,* 19 Cal.4th at p. 162 [credibility of witnesses is an issue for the jury].) Tanks himself testified that he followed Barajas into the garage with a loaded gun and shot him, albeit that Tanks claimed he did so accidentally during a struggle over the gun. In light of Barajas's and Tanks's testimony, the only thing the jury needed to decide was Tanks's intent, which was amply demonstrated by the circumstances of the attack as Tanks himself described it. Significantly, Cook did not purport to know Tanks's intent, and did not testify to Tanks's intent.

Regardless, it was not reasonably probable that Tanks would have received a more favorable result had the trial court given CALCRIM No. 335. The jury in this case had good reason to view Cook's testimony with distrust; he pleaded guilty to the crime and received a more lenient sentence for testifying against Tanks. Moreover, the trial court instructed the jury with CALCRIM No. 226 that it should consider whether any witness was biased or prejudiced, or had a personal interest in how the case was decided. The trial court also instructed the jury with CALCRIM No. 316 that it could consider a witness's commission of a felony in evaluating the credibility of his or her testimony. (See *Gonzales, supra,* 52 Cal.4th at p. 304 [where trial court instructed jury to view testimony with

68

sufficient care and caution failure to give accomplice instructions was harmless].) The jury was on notice that it should treat Cook's testimony with caution. Accordingly, it was not reasonably probable that Tanks would have achieved a different outcome had the trial court instructed the jury with CALCRIM No. 335. (*People v. Miranda* (1987) 44 Cal.3d 57, 101 [where trial court fails to give accomplice instructions and evidence is insufficient to corroborate the accomplice's testimony, "reversal is not required unless it is reasonably probable a result more favorable to the defendant would have been reached"].)

### Attempted Voluntary Manslaughter Under Heat of Passion

Tanks next contends that the trial court committed prejudicial reversible error by failing to instruct on a heat of passion theory of attempted voluntary manslaughter pursuant to CALCRIM No. 570. He argues that substantial evidence supported a conviction of the lesser included offense, such that the trial court had a sua sponte duty to give the instruction. We disagree.

Attempted voluntary manslaughter is a lesser included offense of attempted murder, and the trial court must instruct the jury on the theory where there is substantial evidence to support it. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708 (*Gutierrez*).) Either imperfect self-defense or heat of passion will reduce an attempted killing

69

from attempted murder to attempted voluntary manslaughter by negating the element of malice. (*Ibid.*)

"Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. . . . [¶] Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation. [Citation.] "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" [Citation.]' [Citation.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 759.) To establish attempted voluntary manslaughter under a heat of passion theory, the defendant must affirmatively demonstrate both provocation and heat of passion. (*Gutierrez*, *supra*, 112 Cal.App.4th at pp. 708–709.)

To support his argument that a heat of passion instruction was required, Tanks points to Barajas's testimony that he threatened Tanks with a bat and stated he would "fuck [him] up" that morning after the men quarreled about Salas. Tanks also argues that his own testimony constituted substantial evidence of heat of passion: Tanks testified that Barajas confronted him in the apartment the morning of the shooting, pointed a gun at Tanks in the

afternoon as he was talking to Woods, and pointed a gun at Tanks again as he was driving away.

The evidence that Tanks highlights demonstrates provocation (though not necessarily provocation that would cause a reasonable person to react as Tanks did), but it does not demonstrate that Tanks subjectively acted under the influence of a strong passion. All of the evidence presented was to the contrary: Tanks testified that he carried the gun into the garage to scare Barajas and had no intention of shooting him. Tanks explained that he fired the first shot to scare Barajas after Barajas threw something at him, but testified that after that he did not fire the gun intentionally. Tanks claimed that the gun fired the subsequent shots because he and Barajas were fighting for control of it and squeezed the trigger. The prosecution's theory was that the attempted murder was premeditated and deliberate, not the product of a rash emotional reaction. Accordingly, we conclude that Tanks was not entitled to the instruction because he failed to affirmatively demonstrate the subjective component of heat of passion.

Even if Tanks had introduced evidence that he acted under a strong passion, however, his claim would still fail. The jury's finding that the attempted murder was deliberate and premeditated was inconsistent with voluntary manslaughter, and eliminated any reasonable possibility of prejudice. (*People v. Prettyman* (1996) 14 Cal.4th 248, 276 (*Prettyman*).)

## Self Defense

Tanks also argues that the trial court erred in denying his request for an instruction that self-defense is a complete defense to murder under CALCRIM No. 3470. He asserts that the evidence that Barajas threatened him once with a bat and twice with a gun is sufficient to warrant giving the instruction. We agree with the trial court that it is not.

"'To justify an act of self-defense . . . the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him. [Citation.]' (*People v. Goins* (1991) 228 Cal.App.3d 511, 516, italics in original.) The threat of bodily injury must be imminent (*In re Christian S.* (1994) 7 Cal.4th 768, 783), and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]' [Citations.]" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064–1065.)

Tanks's argument that the evidence showed he shot Barajas in the reasonable belief that he was about to inflict serious bodily injury upon him is inconsistent with his defense at trial that the shooting was accidental. He was not entitled to the instruction. (See *Boyer*, *supra*, 38 Cal.4th at p. 469 [instruction on self-defense required only "'if it appears the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"].)

72

Regardless, as with heat of passion, there can be no prejudice because the jury's finding that the attempted murder was deliberate and premeditated was inconsistent with self-defense. (*Prettyman*, 14 Cal.4th at p. 276.)

### 8. Cumulative Error

Tanks contends that the cumulative errors at trial deprived him of due process. The trial court erred in two instances, the admission of Detective Goossens's testimony about Barajas's state of mind and failing to instruct on accomplice liability, and we both errors harmless. There was no cumulative error.

### 9. Error in the Minute Order Regarding Fines and Fees

The parties agree that the trial court waived the imposition of fines, fees, and assessments at the sentencing hearing, and that the People made no objection, thereby waiving any challenge on appeal. The abstract of judgment properly reflects the trial court's pronouncement, however, the minute order dated January 15, 2020 improperly states the court imposed a $300 restitution fine (§ 1202.4), a $300 suspended parole revocation fine (§ 12022.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 criminal conviction assessment (Gov. Code, § 70737), and must be corrected. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385 ["Where there is a discrepancy between the oral

pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls."].)

## DISPOSITION

We order that the notation that the trial court imposed a $300 restitution fine (§ 1202.4), a $300 suspended parole revocation fine (§ 12022.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 criminal conviction assessment (Gov. Code, § 70737), be stricken from the minute order dated January 15, 2020.  In all other respects, we affirm the trial court's judgment.


MOOR, J.


We concur:


RUBIN, P.J.


KIM, J.

74